FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 18 2008

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT OF ARKANSAS
EASTERN DIVISION

SMART CHOICE AGENTS
PROGRAM OF ARKANSAS, INC.                                    PLAINTIFF

VS.                         CASE NO. 4·08-CV-0619 JLH

This case assigned to District Judge Holmes
WORLDWIDE INSURANCE NETWORK, INC.  and to Magistrate Judge Young   DEFENDANTS

**COMPLAINT FOR ACCOUNTING, BREACH OF CONTRACT, VIOLATION
OF THE ARKANSAS FRANCHISE PRACTICES ACT
AND INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

Smart Choice Agents Program of Arkansas, Inc., an Arkansas corporation ("Plaintiff"), for its Complaint for Accounting, Breach of Contract, Violation of the Arkansas Franchise Practices Act, and Intentional Interference with Contractual Relations, alleges and states as follows:

PARTIES

1.  Smart Choice Agents Program of Arkansas ("Plaintiff") is an Arkansas corporation, formed by Charles Hadfield, its President and Sole Shareholder, for purposes of entering into and performing the terms of the Smart Choice Managing Agent Agreement executed between the Plaintiff and the Defendant on January 5, 2001 ("Managing Agent Agreement"). At the time the Managing Agent Agreement was executed, Charles Hadfield was also the owner of the Hadfield Agency, Inc. ("Hadfield Agency"), which had its principal place of business located at 11524 Rodney Parham Road in Little Rock, Arkansas 72212. Shortly after this agreement was executed, the Hadfield Agency and Plaintiff moved their office to 500-D Pleasant Valley Drive, Suite 102, Little Rock, 72227, and remain at this address at this time. The Managing Agent Agreement contemplated that Plaintiff and the Hadfield Agency would continue to

1

operate their businesses from a fixed location in Little Rock, Arkansas (the "Little Rock Office"), and they have continued to maintain this Little Rock Office to this date.

2. Worldwide Insurance Network, Inc. ("Defendant") is a corporation organized and operating under the laws of the State of North Carolina, with its principal place of business located in Greensboro, North Carolina 27408.

## JURISDICTION AND VENUE

3. The Managing Agent Agreement obligated the Plaintiff, at its sole risk and expense, to invest its time and money to introduce the Smart Choice Agents' program exclusively in the State of Arkansas, including the obligation to identify, recruit, train and manage those agents and their participation in the Smart Choice Agents Program (the "Program").

4. The Managing Agent Agreement resulted in the creation of a "franchise" under Arkansas law (A.C.A. § 4-72-201 to -208), and Plaintiff is entitled to the benefits and protection offered by these statutory provisions. The Managing Agent Agreement was a written agreement, valid for a definite ten year period with the possibility of renewal for an additional indefinite period, in which Defendant granted to Plaintiff the right and license to use Defendant's trade name, trademark, and related characteristics associated with the Program, and Defendant supplied papers and forms for Plaintiff's use in performing the obligations imposed upon it by that agreement. Pursuant to the terms of the Managing Agent Agreement, Plaintiff sought to recruit agents within the exclusive territory of Arkansas to sell insurance policies and related insurance services made available to those Agents by Defendant.

5. The Little Rock Office is a "place of business" as defined in A.C.A. § 4-72-202(6), and the Managing Agent Agreement contemplated that this location would be

a fixed geographical location from which Plaintiff would market the Program and offer for sale and sell Defendant's insurance services and policies. Plaintiff was not required to operate its business on or from premises which were occupied by the Defendant, nor did Plaintiff operate as a door-to-door salesman.

6. This court has subject matter jurisdiction of this action under 28 U.S.C. § 1332, because the parties are diverse and the amount in controversy exceeds $75,000, and venue is appropriate under 28 U.S.C. 1391(a)(2).

## FACTS

7. After a courtship which began in April, 2000, and spanned several months, and several meetings and discussions between Defendant and Charles Hadfield, Plaintiff agreed that it would sign an agreement obligating it to introduce the Program in the State of Arkansas, but understood from his discussions that the agreement would have a ten year initial term, and could be extended indefinitely thereafter.

8. When Defendant presented Plaintiff with the Managing Agent Agreement for execution, it included a Schedule N that was titled "Schedule N [Conditions for Non-Performance]". It stated that "Managing Agent will be terminated for non-performance if--" the numbers inserted in the blanks for nine following subsections were not complied with by the Managing Agent. This concept had never entered into any of the discussions between Plaintiff and Defendant. Before executing the agreement, Plaintiff raised his concerns about the Schedule N provisions, yet Defendant dismissed those concerns stating that it didn't matter what numbers were inserted in the blanks because that performance criteria, and any numbers inserted into the blanks, would never matter, and for the Plaintiff "not to worry about it". Defendant also suggested that Plaintiff go ahead and execute the Managing Agent Agreement and leave the Schedule N spaces blank, and

3

they would talk about it later. Based upon these assurances, Plaintiff executed the Managing Agent Agreement in Little Rock, which included Schedule N with nothing in the blanks, and forwarded it to Defendant.

9. During subsequent discussions regarding Schedule N and the numbers to insert, Plaintiff suggested to Defendant that they leave them blank based upon Defendant's assurances that the schedule did not matter; Defendant responded that the insurance companies they would be representing required the Managing Agent Agreement to have these Schedule N provisions but Defendant again assured Plaintiff that they would never be used or relied upon to take adverse action against Plaintiff. Based upon these additional assurances, Plaintiff and Defendant discussed numbers to insert in those blanks on Schedule N.

10. Pursuant to the terms of the Managing Agent Agreement, Charles Hadfield established a corporation separate from the Hadfield Agency, named the Smart Choice Agents Program of Arkansas, Inc. ("Plaintiff"), and commenced performance of the obligations imposed by the Managing Agent Agreement.

11. Pursuant to the Managing Agent Agreement, Plaintiff incurred considerable expense and spent considerable time recruiting Agents within its exclusive territory to join and participate in the Program. Despite this effort, and incurring considerable expenses, Plaintiff's first commission check was not received until August 15, 2001, almost eight months after the Managing Agent Agreement was executed, and it was for only $102.49.

12. Since its execution, Plaintiff has substantially performed the material obligations imposed upon it by the Managing Agent Agreement, and his territory, the State of Arkansas, has been consistently ranked among the top performing territories in

the Program. True to Defendant's assurances, Defendant and its Officers never referred to Schedule N, or its provisions, and never measured Plaintiff's performance against those provisions from execution of the Managing Agent Agreement until February 20, 2008.

13. Defendant also developed and used Score Cards to evaluate the quality of performance by the Managing Agents appointed in the various states, and the criteria used in these Score Cards did not mention or refer to any of the provisions stated in Schedule N. Based upon those Score Cards, Plaintiff's rankings among 29 other Managing Agents for the available months this year were outstanding, consisting of the following: January -1st; February – 3rd; March – 1st; May -1st; and FIRST OVERALL for the first six months of 2008.

14. Despite this substantial performance, Defendant had apparently decided to change the way it conducted business with its Managing Agents and their Agents to one in which the Agents and the Managing Agents were to pay it a fee for the right to be a part of the program. This 'new program' was designed to give the Defendant a greater 'piece of the pie' than provided by the Managing Agent Agreement, and it also provided less protections for the Managing Agent than were provided in the existing agreement, as well as less incentive and less protection to the Agents that the Managing Agent had recruited, and would be required to continue to recruit.

15. Anxious to implement its new program, Defendant identified the territories essential to the future success of this new business model. But, the termination provisions of the existing Managing Agent Agreement did not allow Defendant to terminate Plaintiff or any of the other Managing Agents immediately because: (a) they had not been convicted of a crime involving fraud, misrepresentation, or other acts of

moral turpitude; (b) they had not had their insurance licenses revoked; and (c) they were not in bankruptcy, nor were they insolvent.

16. Therefore, to further its goal to take over the operations of the Managing Agents in these essential territories, including Arkansas, Defendant had to allow the contract to run the additional four years required by the Managing Agreement. Alternatively, Defendant could try intimidating the Managing Agents into signing onto the 'new program' by threatening termination based upon their alleged failure to comply with the Schedule N provisions, despite the fact that those provisions had never guided the parties' performance, and despite Defendant's earlier repeated assurances that those provisions would never matter or ever be enforced.

17. Defendant chose the 'low road', and sent notices of termination for non-performance to those Managing Agents in its desired territories, based upon their alleged failure to perform the Schedule N provisions, even though Defendant had represented to Plaintiff and to other Managing Agents that those provisions were meaningless and would never be enforced. The Notice of Termination of the Smart Choice Managing Agent Agreement sent to Plaintiff on February 20, 2008 is attached as Exhibit A. This Notice was Defendant's first reference to the provisions in Schedule N, and to their alleged importance since execution of the Managing Agent Agreement in January, 2001.

18. Despite the alleged non-performance on which the termination decision was based, the Notices of Termination were accompanied by letters sent the same day which offered to allow Plaintiff and the other Managing Agents the right to continue to represent Defendant in their respective territories as long as they would execute documents evidencing Defendant's new business model; these new agreements were drawn more to Defendant's advantage, to the detriment of the Plaintiff and the Agents it

had recruited and would recruit to the Program. A copy of Defendant's letter to Plaintiff is attached as Exhibit B.

19. After it became obvious that Plaintiff would not agree to continue as the Managing Agent pursuant to the Defendant's desired 'new program', Defendant offered Plaintiff a bonus to end the Managing Agent Agreement immediately, without the required six month cure period. This proposal also contemplated that Defendant could immediately hire two of Plaintiff's employees. Plaintiff declined this offer.

20. After the Notice of Termination on February 20, 2008, Defendant engaged in the following conduct which interfered with Plaintiff's interests under the Managing Agent Agreement:

a. Defendant began directly contacting Plaintiff's employees, requiring that they spend time learning Defendant's 'new program', including attending seminars and becoming acquainted with Defendant's 'new business philosophy', while also suggesting that substantially increased compensation for them was just around the corner, despite the fact that they were still employees of the Plaintiff and that their salaries and benefits were Plaintiff's expense and not Defendant's; these actions materially impaired the relationships between Plaintiff and those employees; and

b. Defendant began directly contacting the Smart Choice Agents in Arkansas that Plaintiff had signed onto the Program; these communications included promotions that provided incentives to those agents to focus their efforts on sales of certain products on Defendant's behalf, and these communications expressly stated that there would be no commission or override paid to Managing Agents, including the Plaintiff.

7

## COUNT I. – REQUEST FOR ACCOUNTING

21. Page 5 of the Managing Agent Agreement imposes only four obligations upon the Defendant. Item C on that page obligates the Defendant to keep complete and accurate records of all transactions associated directly or indirectly with the Managing Agent Agreement and to make these records available for examination purposes upon demand by Managing Agent at any reasonable time during normal business hours.

22. Item D obligates the Defendant as follows:

> "All sources of [Defendant] revenue directly or indirectly related to or based on this Agreement shall be promptly and fully disclosed to the Managing Agent."

23. By letter dated March 27, 2008, responsive to Defendant's Notice of Termination, Plaintiff requested Defendant to comply with this provision in the Managing Agent Agreement, requesting as follows:

> "[Plaintiff] does not believe that [Defendant] has fully disclosed or accounted for the compensation received from Travelers for the trailing five year period from 2008 back to 2004, and demand is made for [Defendant] to promptly perform the obligations imposed upon it by this provision of the Managing Agent Agreement."

24. Though Defendant responded to Plaintiff's letter through its legal counsel, that response did not mention Plaintiff's request for Defendant to provide proof of compliance with the provisions of Item D of the Managing Agent Agreement, nor did it offer either performance of this obligation or access to the Defendant's books and records pursuant to the provisions of Item C.

25. Plaintiff is entitled to the requested accounting, and requests that the Court enter its Order directing the Defendant to provide Plaintiff with all sources of Defendant's revenue directly or indirectly related to or based on the Managing Agent Agreement since its execution in January, 2001, and that Defendant be directed to make

its complete and accurate records of all transactions associated directly or indirectly with the Managing Agent Agreement available for examination purposes by Plaintiff at a time reasonable for Plaintiff and its accountant.

26. The Court should award Plaintiff judgment for any and all compensation that this accounting shows is due the Plaintiff pursuant to the Managing Agent Agreement that has not been paid.

## COUNT II: BREACH OF CONTRACT AND VIOLATION OF THE ARKANSAS FRANCHISE PRACTICES ACT

27. Plaintiff restates and re-alleges the allegations set forth in Paragraphs 1 through 26 of this Complaint.

28. The allegations set forth in Paragraphs 3, 4, and 5 establish that the Managing Agent Agreement resulted in the creation of a "franchise" under A.C.A. § 4-72-201 to -208, and Plaintiff is entitled to the benefits and protection offered by these provisions of Arkansas law.

29. Defendant, illegally and without just cause, sent Plaintiff Notice that the contract was being terminated for Plaintiff's alleged failure to comply with the provisions of Schedule N, but those provisions were waived and were not otherwise part of the parties' agreement, and were not enforceable, and this Notice of Termination sent by Defendant was a material breach by Defendant of the obligations imposed upon it by the terms of the Managing Agent Agreement.

30. Plaintiff substantially performed the obligations imposed upon it by the terms of the Managing Agent Agreement, and Defendant did not have cause for its termination of that Agreement; its action in terminating the agreement is a breach of that Agreement, entitling Plaintiff to recover its damages sustained as a result of that breach,

including its lost profits resulting from this termination of the agreement prior to the end of its term, including any extensions required by the Arkansas Franchise Practices Act.

      31.    On the basis of modification, prevention, waiver and/or estoppel, Defendant is not entitled to terminate the Managing Agreement for alleged non-compliance with any provisions therein that pertain to Schedule N for each and every one of the following reasons:

    a.    Pursuant to the Franchise Practices Act, and general contract law, Plaintiff and Defendant owed each other a duty of good faith and fair dealing in performing the obligations imposed upon them by the Managing Agent Agreement, and Defendant's reliance upon the provisions regarding Schedule N as a device to force Plaintiff to sign onto Defendant's new concept is a violation of that duty, and actually illustrates Defendant's bad faith;

    b.    Defendant assured Plaintiff at the time that the Managing Agent Agreement was executed that the Schedule N provisions were inconsequential, unimportant and would never be enforced, and Plaintiff reasonably relied upon those assurances in executing the agreement and commencing performance pursuant to its terms. Without these assurances, Plaintiff would not have executed the Managing Agent Agreement, nor would it have invested its time and resources in developing the Program in the State of Arkansas;

    c.    From January 5, 2001 through and until February 20, 2008, the Schedule N requirements were never referenced nor were they used to evaluate the quality of Plaintiff's performance, or the performance of any of the other Managing Agents, and this course of performance, together with Defendant's words and actions, modified

the agreement to eliminate those provisions, or alternatively, operated to waive the applicability of those provisions to the parties' relationship;

d. Defendant has prevented Plaintiff from complying with the provisions set forth in Schedule N because it has not satisfied its obligations to provide Plaintiff with the quality, number and type of insurance carriers and products necessary to have a chance to satisfy any standards stated in Schedule N, and those standards are not now and have never been obtainable for those reasons;

e. On information and belief, none of the Managing Agents are in compliance with the Schedule N requirements in any of their contracts, and Defendant is selectively enforcing these requirements by singling out a few of the Managing Agents for termination for their alleged non-performance of these provisions, which is a breach of its obligation of good faith and fair dealing;

f. 'Good cause' does not exist for termination, as required by the Franchise Practices Act, because the requirements imposed, or sought to be imposed, by Defendant are discriminatory in their manner of enforcement against Plaintiff compared with the requirements imposed on other similarly situated Managing Agents;

g. Defendant terminated Plaintiff's franchise without good cause, because the alleged grounds for termination were unsatisfactory performance, but Plaintiff received emails from Defendants' agent commending his exemplary performance within weeks of receiving the letter informing Plaintiff he was being terminated, and also offered to allow Plaintiff to continue serving as managing agent under the 'new program', despite its alleged unsatisfactory performance; and

h.	In their negotiations regarding the Schedule N provisions and why they had to be included in the express terms, Defendant falsely represented to Plaintiff that the insurance companies they represented required the Schedule N provisions, despite Defendant's assurances that they would never matter or ever be enforced.

## COUNT III. – INTERFERENCE WITH CONTRACTUAL RELATIONSHIP WITH PLAINTIFF'S AGENTS

32.	Plaintiff restates and re-alleges the allegations set forth in Paragraphs 1 through 31 of this Complaint.

33.	As stated in Paragraph 3, Plaintiff's obligations included identifying, recruiting, training, and managing the Smart Choice Agents he recruited.

34.	Defendant's conduct, also described above in Paragraph 20(b), was improper because the Managing Agent Agreement obligated Plaintiff to manage its agents and, in so doing, to communicate with those agents and serve as the intermediary between Defendant and those agents. In an effort to jumpstart its "new program" before any termination was effective, Defendant began communicating with the Smart Choice Agents directly in an attempt to exclude Plaintiff and undermine his role in the Program, while also encouraging the agents to sell certain products for Defendants, and simultaneously costing Plaintiff time and expense in correcting misinformation included in Defendant's direct communication with those Agents.

35.	These communications were sent by Defendant to promote its interests over the interests of Plaintiff, and were an interference with Plaintiff's contractual interest with these agents.

36.	As a result of Defendant's conduct, Plaintiff's relationships with the Smart Choice Agents were impaired, and Plaintiff was damaged.

## COUNT IV. – INTERFERENCE WITH CONTRACTUAL RELATIONSHIP WITH PLAINTIFF'S EMPLOYEES

37. Plaintiff restates and re-alleges the allegations set forth in Paragraphs 1 through 36 of this Complaint.

38. As stated in Paragraphs 1, 3, 5, and 10, the Managing Agent Agreement contemplated that a corporation would be formed and a business office would be maintained by Plaintiff, and it can reasonably be inferred that Plaintiff would hire employees to aid him in conducting the corporation's business.

39. Defendant's conduct, also described above in Paragraph 20(a), was improper because Defendant contacted Plaintiff's employees and directed them to learn Defendant's new program even though they were employees of Plaintiff, not employees of Defendant, and even though Defendant had no real authority over them, because their salaries and benefits were paid by Plaintiff.

40. Once again, Defendant sought to "jump start" its new program by "taking over" Plaintiff's employees; teaching the new program to employees who already understood Defendant's business because of their prior work for Plaintiff; and using this six (6) month termination period to its advantage by training the employees in the new program, and promoting Defendant's interest over the interests of the Plaintiff.

41. As a result of Defendant's conduct, Plaintiff's relationships with his employees were substantially impaired, and Plaintiff was damaged.

WHEREFORE, Plaintiff requests that the Court grant it the following relief:

(a) Order an accounting as required by the Managing Agent Agreement, and grant Plaintiff judgment against the Defendant for any compensation shown by this accounting to be due for any underpayment of commissions and other compensation due it under the agreement;

(b) Grant it judgment for all damages sustained by Plaintiff as a result of Defendant's termination of the Managing Agent Agreement without cause, including damages for the profits lost as a result of this termination prior to the end of initial ten year term, and any further extension provided by that agreement and required pursuant to the provisions of the Arkansas Franchise Practices Act;

(c) Grant it judgment for all damages caused by the Defendant's intentional interference with Plaintiff's relationships with its employees and agents that it recruited into the Program;

(d) The judgment that Plaintiff is entitled to receive for damages sustained should be determined by the court or jury; this amount exceeds the minimum amount necessary for diversity jurisdiction, and Plaintiff contends this amount could be as much as $2,000,000.00;

(e) That it be awarded attorneys fees and costs incurred in bringing this Action; and

(f) Such other and further relief as the court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

SMART CHOICE AGENTS PROGRAM OF ARKANSAS

By Its Attorneys,

ROBINSON, STALEY, MARSHALL & DUKE
400 West Capitol, Suite 2891
Little Rock, Arkansas 72201
(501) 374-3818

By: *[signature]*
Wm. David Duke, Bar No. 79056



Smart Choice® | The freedom to succeed.

Via U.S. Registered Mail

February 20, 2008

Chuck Hadfield
Smart Choice Agents Program of Arkansas, Inc.
500 D Pleasant Valley Drive, Suite 102
Little Rock, AR 72221

Dear Chuck,

    I am writing to give notice of termination of the Managing Agent Agreement between Worldwide Insurance Network, Inc. ("WIN") and Smart Choice Agents Program of Arkansas, Inc. dated January 5, 2001. This termination is based on your failure to perform the criteria set forth on Exhibit N to the Agreement, and is effective on August 19, 2008 unless you attain compliance by that date.

    Please return all documents, in paper or electronic format that refer or relate in any way to Smart Choice, Smart Choice Agents Program, all Smart Choice Agents, and all Smart Choice Carriers on the termination date. Also, please be advised that the confidentiality and non-compete provisions of the Agreement survive termination, and your authority to use the name and trademarks, Smart Choice, Smart Choice Agents Program, and all of WIN's other trade marks and logos, ends on the termination date.

Very Truly Yours,

Douglas S. Witcher
Chief Executive Officer

Mailing: 1589 Skeet Club Road #102-PMB349 • High Point, NC 27265
(336) 217-4650 • Toll Free (888) 264-3388 • Fax (336) 217-4666
*Provided by Worldwide Insurance Network, Inc.*



EXHIBIT A

**Smart ★ Choice®** | *The freedom to succeed.*

February 20, 2008

Chuck Hadfield
500 D Pleasant Valley Drive, Suite 102
Little Rock, AR  72221

Dear Chuck,

Accompanying this letter are the documents we discussed during our phone call Wednesday 20, 2008. Included are:

Notification of Termination. This letter states that, if within the next six months you have not met the contractual obligations of your current Managing Agent Agreement, we will be required to revoke your ability to continue to market the Smart Choice Agents Program (per terms of the agreement this letter has also been sent certified mail, return, receipt request).

New Managing Agent's Agreement. This agreement is being offered to you so that you can continue to market the Smart Choice Agents Program without interruption. By signing this new agreement, you are also eligible to sign an Area Representative's Agreement that will allow you to market the Smart Choice Insurance Center franchise program.

If you choose not to sign the new Managing Agent's Agreement, but instead attempt to attain compliance under your existing contract, you may not sign the Area Representative's Agreement. This means that we may proceed to assign an Area Representative in your territory to market the franchise program.

Smart Choice Franchise Corporation Area Representative Agreement. This agreement allows you to move forward with us as a strategic partner in marketing the franchise program in your territory.

Area Representative's Operations Manual. This manual provides additional detail about the roles, responsibilities and expectations of an Area Representative.

Smart Choice Insurance Center Franchise Disclosure Document. The FDD is enclosed to give you additional information about the offering we are making to potential franchisees.

Please remember that the Confidentiality Agreement you signed when you joined the Smart Choice Agents Program is an inclusive document that prevents you from sharing or disclosing the enclosed documents or any information contained therein with anyone other than an advisor you choose to help you in evaluating your decision.

Mailing: 1589 Skeet Club Road #102-PMB349 • High Point, NC 27265
(336) 217-4650 • Toll Free (888) 264-3388 • Fax (336) 217-4666
*Provided by Worldwide Insurance Network, Inc.*



EXHIBIT B

Here are some key dates to keep in mind:

> March 6    Date by which we must have received, in writing, your decisions regarding your Managing Agent's Agreement and Area Representative's Agreement.
>
> March 9 – 13    Mandatory franchise compliance and educational training at Smart Choice Headquarters.

I realize that this package includes a tremendous amount of new information – and represents a maturing of Smart Choice. All the members of the Smart Choice management team and I are available to discuss your questions and concerns.

Your continued partnership with us is tremendously important, and I am especially looking forward to the next phase of our journey together.

Sincerely,

Simon Gislimberti